Present: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and
Lemons, JJ., and Carrico, S.J.

THOMAS MICHAEL HOLSAPPLE

                                              OPINION BY
v.  Record No. 030334        SENIOR JUSTICE HARRY L. CARRICO

COMMONWEALTH OF VIRGINIA                    October 31, 2003


            FROM THE COURT OF APPEALS OF VIRGINIA


     Code § 18.2-200.1 provides in pertinent part as follows:

     If any person obtain from another an advance of money,
     . . . with fraudulent intent, upon a promise to perform
     construction . . . of any building or structure
     permanently annexed to real property . . . and fail or
     refuse to perform such promise, and also fail to
     substantially make good such advance, he shall be deemed
     guilty of the larceny of such money . . . if he fails to
     return such advance within fifteen days of a request to
     do so sent by certified mail, return receipt requested,
     to his last known address or to the address listed in the
     contract.

     The defendant, Thomas Michael Holsapple, was convicted in

a bench trial of violating Code § 18.2-200.1, and he was

sentenced to serve twenty years in the penitentiary, with ten

years suspended.  The Court of Appeals affirmed the

conviction, holding the trial court did not err in ruling, (1)

that Code § 18.2-200.1 does not require proof of actual

receipt by a contractor of a request to return an advance of

money, Holsapple v. Commonwealth, 39 Va. App. 522, 533, 574

S.E.2d 756, 761 (2003), and (2) that Holsapple's

unsatisfactory performance as demonstrated by the record

amounted to a failure to perform under Code 18.2-200.1, id. at

537, 574 S.E.2d at 763. We awarded Holsapple an appeal limited to consideration of the Court of Appeals' affirmance of these two rulings.

## BACKGROUND

Viewed in the light most favorable to the Commonwealth, the evidence shows that in 1998 the home of Sandra P. Frazier was destroyed by fire. She and her brother-in-law, Calvin B. Frazier, entered into a verbal contract whereby Calvin agreed to install a modular home in place of the burned structure. On May 12, 1998, Calvin contracted with Doug R. Currier, doing business as Star Bright Construction,[1] for the building of a foundation for the installation of a double-wide modular home. Currier held a Class C contractors license, permitting him to bid on and perform construction contracts not exceeding $7,500.00 per contract or $150,000.00 in a year.

Holsapple was the manager and agent of Star Bright Construction. On June 8, 1993, the Virginia Department of Professional and Occupational Regulation permanently revoked Holsapple's license as a building contractor. Notwithstanding, he accepted advances of money to perform construction work on at least three occasions prior to the Frazier's May 12, 1998 contract with Star Bright. On April

---

[1] Although a printed business form used by Star Bright Construction shows Doug Currie as the owner, he is referred to everywhere else in the record and briefs as Doug Currier.

14, 1998, Holsapple was convicted on three counts of construction fraud and was sentenced on July 24, 1998, to fifteen years' imprisonment, with all but fifteen months suspended. He was released on bond and scheduled to report to jail on August 11, 1998, but actually reported on August 31, 1998.

Holsapple was present when the May 12, 1998 contract between Calvin Frazier and Star Bright was entered into, but Currier signed the contract. At the time, Calvin paid $6,000.00 toward the contract price of $12,500.00 and paid the balance on June 2, 1998. Although Calvin had paid for the work in full, Holsapple approached Ms. Frazier in July or August of 1998 and told her that there was an outstanding balance due of $1,100.00 for the work on the foundation and that he would place a lien on her property if she did not pay the $1,100.00. Holsapple and Currier also told Ms. Frazier that the modular home Calvin was installing was poorly constructed, and they offered to take over the project, tear down what had been constructed, and erect a "stick-built" home for her.

Ms. Frazier paid Holsapple the $1,100.00 and agreed on August 5, 1998, to accept the offer of Holsapple and Currier to take over the project, which was supposed to cost $40,000.00. Both men insisted that the deposit for the new

3

work be paid in cash. Holsapple determined that the amount needed was $15,000.00. Ms. Frazier paid this amount to Currier, but Holsapple wrote "received of Sandy Frazier $15,000.00 in Cash Contracts for home" on the Proposal and Acceptance form the two men used in their business.

On August 6, 1998, Holsapple and Currier demanded an additional $9,000.00 from Ms. Frazier, which she paid. Holsapple wrote the receipt for the payment, and Currier signed it. On August 10, 1998, Holsapple and Currier requested and received another $10,800.00 for the installation of a well and a front porch on the home.

When Ms. Frazier asked Holsapple and Currier whether a building permit was required to stick-build her home, they responded that a permit was not needed because the stick-built house and the existing modular home were the same and she already had a permit for the modular home.

Ms. Frazier paid an additional $7,500.00, including $3,745.00 for roof trusses, as shown on an undated Proposal and Acceptance form filled out by Holsapple. A printed provision on the form stated that "WE PROPOSE hereby to furnish material and labor – complete in accordance with above specifications for the sum of:" but no amount was entered. Instead, a handwritten statement was inserted to the effect that the "Bal for Rafters will be Refunded if other Rafters

4

are installed."  A representative of a local building supply firm testified that someone from Star Bright Construction purchased a set of house trusses on August 7, 1998, at a cost of $983.84, and that the trusses were delivered to the Frazier job site three days later.

The same building supply firm also delivered a white vinyl sliding glass door to the job site for installation in the Frazier home.  The door was unloaded from the delivery truck by Steven R. Buckland, a laborer-carpenter working on the Frazier project, and he leaned the door against a tree. On the same day the door was delivered, Holsapple instructed Buckland to load the door onto Holsapple's truck so he could put it in storage.  Buckland later observed a white vinyl glass sliding door of the same size, dimension, and shape installed in a home Holsapple was building for himself and his girlfriend.

Throughout these transactions, Ms. Frazier dealt primarily with Holsapple.  He "was always the one that was doing all the figuring of what [she would] need and how much [she would] need."  Holsapple determined the amount that was due from time to time, and Ms. Frazier then paid the money to Currier at Holsapple's direction.  Holsapple also purchased the materials that were needed and did all the driving, including transporting Currier to and from the job site.

Although Holsapple reported to the Albemarle-Charlottesville Regional Jail on August 31, 1998, to serve the sentences imposed on the earlier construction fraud cases, he actually left the Frazier job site on August 15, 1998, after the trial judge denied his request for work release so he could continue working on the Frazier job. Currier continued work on the Frazier project until he was incarcerated for a conviction on an unrelated matter and later did some "piddly stuff" after his release from incarceration.

The Albemarle County Building Inspector and a private contractor inspected the Frazier home. No building permit was posted on the property. After the inspection, the house was declared not habitable. Some of the foundation joints had no mortar in them, the sill plate was not attached to the foundation, no hangers had been installed to hold the floor joists in place, the roof trusses were not properly secured or tied together, the roof sheathing was not properly nailed to the trusses, and the shingles were not properly nailed to the roof. The house was not level; on one eight-foot-long wall, there was a three and one-half inch difference in floor to ceiling height between one end and the other. The house, which was fifty-three feet long, sloped six and one-half inches from one end to the other. The porch was not connected

to the house, and there was no cement foundation or other footer to support its weight.

The house was eventually torn down, "even the block work."  In its place, Ms. Frazier built "a prefab home."

On October 23, 1998, Ms. Frazier sent a letter to Holsapple at the Albemarle-Charlottesville Regional Jail, where he was incarcerated, demanding the return of her money, totaling $45,137.16.  She sent a similar letter to Currier. Both letters were sent by certified mail, return receipt requested.  Neither recipient returned Ms. Frazier's money.

NOTICE

Holsapple argues that, by requiring notice to be sent by certified mail with return receipt requested, the General Assembly intended to place a burden on the Commonwealth to put the return receipt into evidence to prove that the notice actually arrived at its intended destination and was received by someone at that address.  Holsapple correctly states that Code § 18.2-200.1 is a penal statute which must be strictly construed against the Commonwealth and in favor of the accused.  Jimenez v. Commonwealth, 241 Va. 244, 251, 402 S.E.2d 678, 681 (1991).  Holsapple also says that the phrase "sent by certified mail, return receipt requested" is ambiguous and that where statutory language permits two

7

tenable constructions, that construction which favors the accused must be adopted.

We do not agree that the statutory language is ambiguous. Hence, we construe the language according to its plain meaning without resort to rules of statutory interpretation. Brown v. Lukhard, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985). The language of Code § 18.2-200.1 plainly means that a request for a return of money advanced on a construction project is sufficient notice if sent by certified mail, return receipt requested, without proof of actual receipt.

Holsapple argues, however, that this Court's decision in Rinkov v. Commonwealth, 213 Va. 307, 191 S.E.2d 731 (1972), stands for the proposition that whenever the legislature requires notice to be sent by certified mail with return receipt requested, it intends to require some evidence of actual receipt. We disagree with Holsapple's analysis of Rinkov.

Rinkov involved a violation of the bad-check law. Code § 6.1-117, now Code § 18.2-183, provided that the making of a check that is refused by the drawee for lack of funds shall be prima facie evidence of intent to defraud unless the check is paid within five days after the drawer receives written notice that the check has not been paid. The statute also provides that "[n]otice mailed by certified or registered mail,

8

<u>evidenced by return receipt</u>, to the last known address of the maker or drawer shall be deemed sufficient and equivalent to notice having been received by the maker or drawer." (Emphasis added.)  Because the notice to the maker or drawer was returned by the post office as "unclaimed" and the return receipt had not been signed, this Court held that the Commonwealth was not entitled to rely on the presumption created by the bad-check statute.  213 Va. at 310, 191 S.E.2d at 733.

One lesson <u>Rinkov</u> does teach is that when the General Assembly wants to require actual notice, it knows how to state the requirement.  It clearly stated the requirement in former Code § 6.1-117, now § 18.2-183, by the addition of the language "evidenced by return receipt," language that does not appear in Code § 18.2-200.1.  To construe Code § 18.2-200.1 as imposing a burden upon the Commonwealth to prove actual receipt would require this Court to add language to the statute the General Assembly has not seen fit to include, an exercise in which the Court is not free to engage.  <u>Barr v. Town & Country Properties, Inc.</u>, 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990).

Nor can Holsapple take any comfort from his reference to the Virginia Tort Claims Act, the Habitual Offenders Act, and the Interstate Agreement on Detainers.  The Tort Claims Act

9

specifically requires the claimant to prove "receipt of the notice [of claim]."  Code § 8.01-195.6.  No such requirement is contained in Code § 18.2-200.1.

With respect to the Habitual Offenders Act, former Code § 46.2-355, repealed in 1999, provided that, unless the defendant was present at the hearing in which he was adjudicated an habitual offender, the clerk was required to mail a copy of the order of adjudication to the defendant at his last known address, and "[m]ailing, by first class mail, shall be deemed adequate notice of the order of the court, and no other notice shall be required."  In Reed v. Commonwealth, 15 Va. App. 467, 424 S.E.2d 718 (1992), the Court of Appeals found that the defendant was entitled to actual notice of his adjudication, not from the language just quoted, but, as Holsapple concedes, from "other language within [the] same statute."  No such "other language" is contained in Code § 18.2-200.1.

Concerning the Interstate Agreement on Detainers, Article III(b), found in Code § 53.1-210, provides that a prisoner held in one state shall give or send his request for final disposition of a charge pending in another state to the warden or other official having custody of the prisoner "who shall promptly forward it . . . to the appropriate prosecuting official and court [of the receiving state] by registered or

10

certified mail, return receipt requested."  Eckard v. Commonwealth, 20 Va. App. 619, 460 S.E.2d 242 (1995), involved the question whether a prisoner incarcerated in Tennessee had followed the proper procedure in requesting that a final disposition be made of a charge pending in Virginia so as to start the clock running on the 180-day period in which the Commonwealth must bring the prisoner to trial or face dismissal of the Virginia charge.

The Court of Appeals quoted from Fex v. Michigan, 507 U.S. 43 (1993), to the effect that the receiving state's receipt of the request starts the clock on the 180-day period and that the requirement for the warden to forward the request " 'by registered or certified mail, return receipt requested' . . . provides for documentary evidence of the date on which the request is delivered to the officials of the receiving State."  Id. at 51.  See Eckard, 20 Va. App. at 627, 460 S.E.2d at 246.  Holsapple points to the statement about "documentary evidence" and invites us to convert it into a requirement that, whenever the phrase "by certified mail, return receipt requested" is used, the Commonwealth must prove actual receipt.  We fail to see the connection Holsapple attempts to make and, accordingly, decline his invitation.

Finally, Holsapple argues that evidence of actual receipt by authorities at the local jail is required to satisfy the

11

due process requirement of the Constitution of the United States.  However, Holsapple did not make this argument in the trial court, and he did not make it in the Court of Appeals until he filed a petition for rehearing.  Having failed to raise the due process claim timely, Holsapple cannot raise it now.  Rule 5:25.[2]

## FAILURE TO PERFORM

Holsapple argues that the Court of Appeals erred in holding that poor quality workmanship can mean a failure to perform within the meaning of the construction fraud statute. He says that the central issue in this phase of his appeal is the meaning of the word "fail" in the statute requiring the Commonwealth to prove that he did "fail or refuse to perform such promise."  He maintains that by construing the phrase "fail to perform" to include some but not all cases of faulty workmanship, the Court of Appeals has rendered the statute impermissibly vague.[3]

---

[2] During argument in the trial court, Holsapple mentioned "fundamental fairness" several times, which he says was sufficient to raise the due process claim.  However, the argument was directed, not to the notice issue, but to Holsapple's claim that he was entitled to a committee or guardian ad litem because of his incarceration, a claim this Court refused to review.

[3] Although Holsapple argues that the Court of Appeals' interpretation has rendered the construction fraud statute impermissibly vague, he does not argue that the statute itself is vague.  Nor does he claim that the statute is overbroad.

12

Holsapple points out that Code § 18.2-200.1 uses the term "fail" in conjunction with the term "refuse," and he says that the use of the latter term "is clearly appropriate because such a refusal would provide direct evidence of the defendant's specific intent to commit larceny." He then says that "[i]n this context, the word 'fail' should be limited to those cases where such a direct admission of intent is not forthcoming from the defendant but other facts and circumstances indicate a specific intent to keep the advance of money and not complete the work."

We disagree with Holsapple that the Court of Appeals' interpretation of Code § 18.2-200.1 rendered the statute impermissibly vague. Quoting Rader v. Commonwealth, 15 Va. App. 325, 332, 423 S.E.2d 207, 212 (1992), a case involving the very statute in issue here, the court made this statement:

> "It is apparent from reason and common sense that construction fraud can occur despite the fact that a builder or contractor begins to perform on the contract. . . The relevant question is whether a builder or contractor obtained an advance based upon future work promised with a fraudulent intent not to perform or to perform only partially, not whether the contractor had performed work for which he was paid."

Holsapple, 39 Va. App. at 537, 574 S.E.2d at 763.

Continuing, the Court of Appeals said:

> Common sense would likewise dictate that a performance of construction which is so poor as to render a structure unsafe or uninhabitable could, under the appropriate circumstances, constitute the failure to perform the contractual promise at issue. Here, the

13

evidence demonstrated that the truss work was done so poorly that the home was simply not safe to live in. Accordingly, while we do not hold that poor workmanship per se constitutes a failure to perform the contractual promise, on these facts we find no error in the trial court's determination that the faulty workmanship in this case constituted a failure to perform within the meaning of the statute.

Id.

Citing Commonwealth v. Carter, 21 Va. App. 150, 153, 462 S.E.2d 582, 584 (1995), Holsapple notes that "[a] penal statute when measured by common understanding and practices must define the proscribed conduct with sufficient particularity to warn a person of what behavior is prohibited."  We are of opinion that the Court of Appeals' construction of Code § 18.2-200.1 satisfies this test.

And, for purposes of this discussion, we will take Holsapple at his word that "[i]n this context, the word 'fail' should be limited to those cases where . . . a direct admission of intent is not forthcoming from the defendant but other facts and circumstances indicate a specific intent to keep the advance of money and not complete the work."  Such other facts and circumstances are abundantly present in this case.  Indeed, the record of Holsapple's conduct reeks with fraud.

Holsapple suggests that the blame for what happened on the Frazier construction project should be placed on Currier. Specifically, Holsapple says that while he negotiated and

14

drafted the contracts with Ms. Frazier, Currier, as the prime contractor, signed all contracts and received all advances of money directly from Ms. Frazier and that she never advanced any money to Holsapple. However, Holsapple forgets Ms. Frazier testified that she dealt only with him, that he told her what to pay and when to pay it, and that she paid the advances to Currier only because Holsapple told her to. Furthermore, Holsapple represented himself as the manager and agent of Star Bright Construction, and the record demonstrates clearly that he and Currier acted jointly throughout the construction project.

"[I]f a person is present at the commission of a crime, inciting, encouraging, advising or assisting in the act done, he is deemed to be an aider and abettor, and is liable as principal." Snyder v. Commonwealth, 202 Va. 1009, 1015, 121 S.E.2d 452, 457 (1961). It is in this light that Holsapple's conduct is to be assessed.

Stripped permanently of his license to perform construction work and awaiting sentence on three convictions for construction fraud, Holsapple undertook a construction project and accepted an advance of money with full knowledge that he would be unable to complete the project if, as it turned out, he was sentenced to incarceration. He says he hoped the sentencing court would put him on work release so he

could complete the project, but there was little chance that would happen and, apparently, it was not seriously considered by the sentencing court. And, to make matters worse, Holsapple continued to ask for and receive advance payments from Ms. Frazier even after he had been sentenced to incarceration and was free on bond.

Further, Holsapple diverted a white vinyl glass sliding door from the Frazier construction project to one of his own. On the threat of filing a lien on her property, he extracted $1,100.00 from Ms. Frazier for work on the foundation when payment in full for that work had already been made. He secured another $3,745.00 from her to purchase roof trusses, for which only $983.84 was paid. He says that the contract with Ms. Frazier concerning the trusses provided that the amount received was for labor as well as materials and, since there was no evidence concerning the cost of labor, he cannot be charged with fraudulent intent with respect to the difference between what was received and what was paid for the trusses. However, the line on the printed form relating to the cost of labor was not filled in but instead contained a handwritten statement that the balance "for Rafters will be Refunded if other Rafters are installed," whatever that means. No such refund was ever made.

16

Finally, the sorry mess Ms. Frazier was left with is conclusive evidence that Holsapple's conduct amounted to more than a mere failure to perform.  Everything about the uninhabitable structure from the unfilled mortar joints in the foundation to the insecure trusses in the roof displays a gross misperformance and corner-cutting on Holsapple's part, done with "a specific intent to keep the advance of money and not complete the work."  Accordingly, we find that all the elements of the crime of construction fraud proscribed by Code § 18.2-200.1 were fully established against Holsapple.

For the foregoing reasons, we will affirm the judgment of the Court of Appeals.

<u>Affirmed</u>.