PRESENT: All the Justices

BENJAMIN B. FITZGERALD

OPINION BY

v.    Record No. 141238           JUSTICE D. ARTHUR KELSEY
                                      April 16, 2015

LOUDOUN COUNTY SHERIFF'S OFFICE

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
J. Howe Brown, Judge

On appeal, Benjamin B. Fitzgerald contends that the circuit court erred in denying his request under the Virginia Freedom of Information Act ("FOIA"), Code § 2.2-3700 et seq., to obtain a copy of a suicide note contained in a criminal investigative file maintained by the Loudoun County Sheriff's Office.  Finding no such error, we affirm.

I.

In October 2007, a neighbor found Charles D. Riechers, a senior United States Air Force official, dead at his Loudoun County home.  Riechers was sitting in his vehicle in a closed garage.  A key was in the ignition, in the "on" position, but the vehicle was not running.  A hose appeared to connect the vehicle's exhaust pipe to a rear passenger window.

Firefighters from the Loudoun County Fire and Rescue Department and deputies from the Loudoun County Sheriff's Office responded to the neighbor's 911 call.  The deputies immediately secured the area with a yellow crime scene tape and started a crime scene access log to record their observations, summarize their interviews with witnesses, and inventory their

collection of physical evidence.  They also conducted a security sweep of the home.  The deputies then turned the incident over to the Criminal Investigations Division of the Sheriff's Office.

A crime scene investigator managed the initial investigation and ordered that the decedent be taken to the morgue for an autopsy.  A detective in the Sheriff's Criminal Investigations Division coordinated the search of the residence after obtaining consent from the decedent's wife.  In the home, investigators discovered various evidentiary clues suggesting that suicide, rather than homicide, could be the cause of death.  Among the items of evidence collected was what appeared to be a suicide note addressed to the decedent's supervisor at the Pentagon.

The detective continued to investigate evidentiary leads and coordinated his investigation with the United States Air Force Office of Special Investigations.  The detective also reviewed the coroner's autopsy report, which concluded that the decedent did not die from any apparent bodily trauma.  After receiving the medical examiner's report, the detective filed his final report concluding:  "This case is now closed, no further investigation is required at this time."  The case file was placed among the closed cases of the Criminal Investigations Division.

In February 2014, Fitzgerald sent a FOIA request to the Sheriff's Office seeking all documents related to the "non-criminal incident report into the suicide of Charles D. Riechers" in October 2007. The Custodian of Records for the Sheriff's Office responded by noting that the records sought were considered to be part of a criminal investigative file. The custodian referred Fitzgerald to Code § 2.2-3706(A)(2)(a) and noted that the Sheriff's Office would not release the file absent a court order.

The Sheriff's Office later provided to Fitzgerald various documents from the criminal investigative file, but withheld the suicide note written by the decedent to his supervisor at the Pentagon. Fitzgerald filed a petition in general district court seeking a mandamus order requiring the production of the withheld suicide note. The general district court denied the petition, as did the circuit court on a de novo appeal.

The circuit court made a factual finding that the requested document was obtained during a criminal investigation. That the investigation did not lead to a criminal prosecution, the court reasoned, did not change the character of the investigative file from criminal to non-criminal. As the court explained:

> Here, they open[ed] a criminal file and then determined that it was a suicide so you want to go back and in retrospect say, well, that wasn't a criminal file. It was a criminal file

by the definition in the Code and if we start saying that we go by what happens later, then I think we open a door that isn't opened by the statute and we create some danger to the community. So I deny the request.

The circuit court entered a final order adopting this reasoning. We granted Fitzgerald's petition for appeal to determine if the circuit court's reasoning is consistent with the provisions of the FOIA.

## II.

On appeal, Fitzgerald contends that the circuit court misapplied FOIA principles. On brief, he requests that we reverse and remand with instructions to the circuit court to order the Sheriff's Office "to disclose Mr. Riechers' letter to his business supervisor" at the Pentagon.[1]

## A.

## Standards of Appellate Review

Our analysis begins, as always, by framing the issues before us within the context of the governing standard of appellate review. "Under well-established principles, an issue of statutory interpretation is a pure question of law which we review de novo." Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007). Our de novo review takes into account any informative views on the legal

---

[1] During oral argument on appeal, Fitzgerald's counsel confirmed that the only document he still seeks is this suicide note. See Oral Argument Audio at 1:08 to 1:36.

4

meaning of statutory terms offered by those authorized by law to provide advisory opinions.[2] Even so, in the end, we alone shoulder the duty of interpreting statutes because "pure statutory interpretation is the prerogative of the judiciary." Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 404, 468 S.E.2d 905, 908 (1996). This axiom stems from basic principles of separation of powers. "It is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).

On the other hand, when the proper construction of a FOIA provision establishes a legal standard governing a factfinding exercise, we give deference to the circuit court's findings of fact and view the facts on appeal "in the light most favorable to the prevailing party." American Tradition Inst. v. Rector & Visitors of the Univ. of Va., 287 Va. 330, 338-39, 756 S.E.2d 435, 439 (2014) (internal quotation marks and alterations omitted). This appellate deference extends not only to the circuit court's resolution of contested evidence, but also to all reasonable inferences that may be drawn from that evidence. "Where divergent or conflicting inferences reasonably might be drawn from established facts their determination is exclusively

---

[2] In this case, we have reviewed the advisory opinions of the Virginia Freedom of Information Advisory Council, particularly Advisory Op. AO-04 (May 22, 2014) and its predecessors. See Code § 30-179(1) (authorizing the Virginia Freedom of Information Advisory Council to issue advisory opinions).

for the fact-finding body." Hopson v. Hungerford Coal Co., 187 Va. 299, 308, 46 S.E.2d 392, 396 (1948).

B.

Virginia Freedom of Information Act

The Virginia FOIA "has existed, in one form or another, since 1968" with the primary purpose of facilitating "openness in the administration of government." American Tradition Inst., 287 Va. at 339, 756 S.E.2d at 439-40. By its own terms, the statute puts the interpretative thumb on the scale in favor of disclosure: "The provisions of [FOIA] shall be liberally construed to promote an increased awareness by all persons of governmental activities and afford every opportunity to citizens to witness the operations of government." Code § 2.2-3700(B). Disclosure exemptions must be "narrowly construed" in favor of disclosure. Id.

Fitzgerald argues on appeal that this laudable statutory bias in favor of disclosure requires that we construe the FOIA to mandate that the Sheriff's Office disclose a suicide note, which was discovered during an ongoing criminal investigation. Like the circuit court, we do not believe that the statutory language can bear the weight of Fitzgerald's argument.

Code § 2.2-3706 governs the disclosure of criminal records. Subsection (A)(1) requires disclosure of certain specific information, including "[c]riminal incident information." Certain types of criminal records not required

6

to be produced under subsection (A)(1) "may be disclosed" under subsection (A)(2) at the discretion of the custodian, if no other law forbids disclosure. "Criminal investigative files" are among the categories of records subject to the "[d]iscretionary releases" provisions of subsection (A)(2).

Code § 2.2-3706(B) governs the mandatory disclosure of "[n]oncriminal records." Among other things, these records include those "required to be maintained by law-enforcement agencies pursuant to [Code] § 15.2-1722." Code § 2.2-3706(B). A records-retention statute outside the text of FOIA, Code § 15.2-1722(A), requires sheriffs and police chiefs to maintain "adequate personnel, arrest, investigative, reportable incidents, and noncriminal incidents records necessary for the efficient operation of a law-enforcement agency." The failure to do so "shall constitute a misdemeanor." Id. Subsection (B) of Code § 15.2-1722 defines "[n]oncriminal incidents records" as "compilations of noncriminal occurrences of general interest to law-enforcement agencies, such as missing persons, lost and found property, suicides and accidental deaths."

### 1. Criminal Investigative Files

The proper sequencing of these provisions begins with an examination of Code § 2.2-3706(A)(1)(a), which requires disclosure of certain specified "[c]riminal incident information." Fitzgerald properly concedes that the requested

7

suicide note does not fall within this mandatory disclosure provision.

We next look to subsection (A)(2)(a), which permits, but does not mandate, disclosure of "[c]riminal investigative files." Sitting as factfinder, the circuit court found that the requested suicide note was one of many documents in a criminal investigative file protected from mandatory disclosure by Code § 2.2-3706(A)(2)(a). At no point did Fitzgerald suggest, nor did any evidence imply, that the Sheriff's Office acted outside its lawful authority in opening a criminal investigative file to investigate the unexpected and unattended death of a senior United States Air Force official. The Sheriff's Office thus had the discretion, but not the duty, to disclose documents within this file.

Even so, Fitzgerald argues, the criminal investigative file lost its character as such when the file was closed by the Criminal Investigations Division of the Sheriff's Office. We find nothing in the statutory text or in its legislative context to support this counterintuitive conclusion.

Suffice it to say, the point of a criminal investigation is to investigate — to determine whether a crime occurred and, if so, who perpetrated it. A criminal investigation may or may not lead to a prosecution. But that does not mean that the application of FOIA disclosure requirements is dependent upon the outcome of the investigation. In this case, investigators

8

discovered the suicide note during an ongoing criminal investigation.  That the investigation was later closed is inconsequential for purposes of FOIA disclosure principles.

### 2.  Noncriminal Records

Fitzgerald next relies upon Code § 2.2-3706(B), which requires the mandatory release of certain records, including those "required to be maintained by law-enforcement agencies pursuant to [Code] § 15.2-1722."  As noted earlier, this non-FOIA records-retention statute requires sheriffs and police chiefs to maintain "adequate personnel, arrest, investigative, reportable incidents, and noncriminal incidents records necessary for the efficient operation of a law-enforcement agency."  Code § 15.2-1722(A).  According to Fitzgerald, documents related to a suicide (including the decedent's suicide note) should be considered "noncriminal incidents records" subject to disclosure under Code § 15.2-1722.

We first address the assumption underlying Fitzgerald's argument.  He seeks a broad construction of Code § 15.2-1722 on the ground that the General Assembly has prescribed that the "provisions" of the FOIA "shall be liberally construed" in favor of disclosure.  Appellant's Brief at 18-19 (quoting Code § 2.2-3700(B)).  We find this argument problematic for several reasons.

9

Code § 15.2-1722 is incorporated by reference in the FOIA but is not codified as a stand-alone provision of the FOIA. That seemingly semantic point unmasks a distinction with a significant difference. Code § 15.2-1722 is a records-retention statute that carries a criminal sanction. If there were any textual ambiguities in Code § 15.2-1722, the rule of lenity would direct us to adopt a narrow construction, thus reducing exposure to criminal liability. That necessarily narrow construction would run contrary to the broad construction required by the FOIA, which expands the scope of disclosure.[3] We need not resolve this conundrum, however, because Code § 15.2-1722 has a plain meaning inconsistent with Fitzgerald's interpretation.

Subsection (B) of Code § 15.2-1722 defines "[n]oncriminal incidents records" as "compilations of noncriminal occurrences

---

[3] Only when a "penal statute is unclear" do Virginia courts apply the rule of lenity and strictly construe the statute in the criminal defendant's favor. Waldrop v. Commonwealth, 255 Va. 210, 214, 495 S.E.2d 822, 825 (1998) (footnote omitted); see also Holsapple v. Commonwealth, 266 Va. 593, 598, 587 S.E.2d 561, 564 (2003) ("We do not agree that the statutory language is ambiguous. Hence, we construe the language according to its plain meaning without resort to rules of statutory interpretation."). The rule of lenity serves only to resolve genuine ambiguities and "does not abrogate the well recognized canon that a statute . . . should be read and applied so as to accord with the purpose intended and attain the objects desired if that may be accomplished without doing harm to its language." Cartwright v. Commonwealth, 223 Va. 368, 372, 288 S.E.2d 491, 493 (1982) (omission in original) (quoting Gough v. Shaner, 197 Va. 572, 575, 90 S.E.2d 171, 174 (1955)).

of general interest to law-enforcement agencies, such as missing persons, lost and found property, suicides and accidental deaths." In ordinary terms, a compilation is something that has been compiled. See generally Webster's Third New International Dictionary 464 (2002) (defining "[c]ompilation" as "the act or action of gathering together written material esp. from various sources" or "something that is the product of the putting together of two or more items"). A compilation of poems, for example, is a collection of different poems.[4] It is not a single poem or even a collection of background materials related to a single poem.

The suicide note, standing alone, cannot constitute a compilation under Code § 15.2-1722(B). The pertinent language requires that "compilations of noncriminal occurrences" be maintained and lists suicides as an example of such occurrences. Code § 15.2-1722(B). A compilation of suicides is a record of more than one suicide. The suicide note may be a compilation of words, but not a compilation of suicides.

We similarly reject the assertion that the entire criminal investigative file maintained by the Sheriff's Office could be

---

[4] See Black's Law Dictionary 344 (10th ed. 2014) (defining "compilation" in the context of copyright law as "[a] collection of literary works arranged in an original way"); accord 17 U.S.C. § 101 (2014) (defining "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship").

11

deemed a compilation of suicide records.  Code § 15.2-1722(B)

addresses "[n]oncriminal incidents records," specifically

defined as "compilations of noncriminal occurrences . . . such

as . . . suicides." (Emphasis added.)  A file containing

reports concerning a single incident, later determined to be a

suicide, is not a compiled collection of information concerning

multiple suicides.  The criminal investigative file in this

case — protected against mandatory disclosure by Code § 2.2-

3706(A)(2)(a) — did not become, and never was, a compilation of

suicides.

Nothing in our reasoning, however, implies that a

compilation can only be a spreadsheet of raw data points or

statistics.  Although it can certainly be that, the statutory

meaning of compilation is not necessarily so limited.  In Tull

v. Brown, 255 Va. 177, 494 S.E.2d 855 (1998), for example, we

treated a 911 tape recording of multiple channels of radio

traffic and telephone calls as a

> grouping of electronically gathered information
> and thus a "compilation." The tape at issue in
> this case is not just a recording of the
> conversation between the 911 caller and the
> dispatcher.  Rather, it is a recording on
> multiple channels of all radio traffic handled
> through the . . . dispatch office in addition
> to conversations occurring on . . . four
> telephone lines and conversations between
> individuals physically in the dispatcher's
> office.  In short, all activity occurring in
> the dispatch office as well as that on the four
> telephone lines is compiled on this tape.

12

Id. at 184, 494 S.E.2d at 858-59.  In Tull, the 911 tape aggregated voice data from multiple sources (radio and telephonic) into a single audio record.  It was this gathering of the many into one that made it a compilation.[5]

For these reasons, both the text and the syntax of Code § 15.2-1722(B) render Fitzgerald's interpretation of it implausible.  Neither the suicide note requested by Fitzgerald nor the investigative file in its entirety was a compilation of records of multiple suicides.  The circuit court, therefore, correctly rejected Code § 15.2-1722(B) as a basis for ordering the disclosure of the suicide note contained in the criminal investigative file.

### III.

In sum, the record supports the circuit court's finding that the suicide note was obtained in the course of a criminal investigation.  Finding no error in the circuit court's application of the governing statutes, we affirm.

Affirmed.

---

[5] The reasoning in Tull that the 911 tape was a compilation led to the conclusion that the tape need not be disclosed under former Code § 15.1-135.1.  That statute provided that "records required to be maintained by this section shall be exempt" from the FOIA.  Former Code § 15.1-135.1(A) (1989 Repl. Vol.).  The General Assembly repealed former Code § 15.1-135.1 in 1997 and reenacted it without the FOIA exemption, recodifying it as Code § 15.2-1722.  See 1997 Va. Acts ch. 587.  In 1999, the legislature added the records kept pursuant to Code § 15.2-1722 to the mandatory disclosure requirements of former Code § 2.1-342.2, the precursor to Code § 2.2-3706(B).  See 1999 Va. Acts chs. 703, 726.

13