Present:   Kinser, C.J., Lemons, Millette, Mims, McClanahan, and
           Powell JJ., and Lacy, S.J.

CAMPBELL COUNTY

                                              OPINION BY
v.  Record No. 101168            CHIEF JUSTICE CYNTHIA D. KINSER
                                           January 13, 2012
CLAUDE M. ROYAL, ET AL.

              FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
                       J. Michael Gamble, Judge

     In this action, the trial court granted summary judgment

against a locality, holding it liable to landowners under the

State Water Control Law, Code §§ 62.1-44.2 through -44.34:28

(the Water Control Law), in particular Code § 62.1-44.34:18(C)

of the "Discharge of Oil Into Waters" Law, Code §§ 62.1-44.34:14

through -44.34:23 (the Oil Discharge Law), for the contamination

of groundwater by leachate and landfill gas.  Because we

conclude that the Oil Discharge Law does not apply to the

passive, gradual seepage of leachate and landfill gas into

groundwater, we will reverse the trial court's judgment.

               I.   MATERIAL FACTS AND PROCEEDINGS

     Claude M. Royal and Virginia H. Royal (the Royals) own,

operate, and reside in "a manufactured home community" known as

"Twin Oaks Park" (the Park), which contains approximately 165

acres situated in Campbell County (the County).[1]  In 2005, when

_____

        [1] Modern Home Construction, Inc., a Virginia corporation
owned by the Royals, owns a small parcel of real estate located
within the Park.  Like the Royals, it was a plaintiff in the
proceedings in the trial court and is an appellee in this

the current litigation began, the Park contained 218 residential lots and had approximately 450 residents. The Park's southern boundary is adjacent to the "Campbell County Sanitary Landfill," an approximately 160-acre "solid waste disposal facility" owned and operated by the County.[2]

The County operates the facility pursuant to a permit originally issued by the Department of Health in 1979.[3] The

---

appeal. In this opinion, we will refer to the Royals and Modern Home Construction, Inc. collectively as "the Royals."

[2] The term "'[s]olid waste disposal facility' means a solid waste management facility at which solid waste will remain after closure." 9 VAC § 20-81-10. The term "'[s]olid waste management facility' . . . means a site used for planned treating, storing, or disposing of solid waste. A facility may consist of several treatment, storage, or disposal units." Id.

The County's permit describes the facility as a "Sanitary Landfill." The term

> "[s]anitary landfill" means an engineered land
> burial facility for the disposal of household
> waste that is so located, designed, constructed,
> and operated to contain and isolate the waste so
> that it does not pose a substantial present or
> potential hazard to human health or the
> environment. A sanitary landfill also may
> receive other types of solid wastes, such as
> commercial solid waste, nonhazardous sludge,
> hazardous waste from conditionally exempt small
> quantity generators, construction demolition
> debris, and nonhazardous industrial solid waste.

Id.

[3] Such permits are now issued by the Department of Environmental Quality. See Code § 10.1-1408.1(A). Prior to 1986, the Department of Health regulations controlled the disposal of solid waste. Those regulations have since been replaced by the Virginia Solid Waste Management Regulations, 9 VAC § 20-81-10, et seq.

facility contains three disposal areas: "the closed capped, and unlined Phase II Disposal Area," the active "Phase III Disposal Area," and a "Phase IV Disposal Area to be constructed in the future." The Phase II Disposal Area was closed in 1995 and is the area from which the solid waste constituents at issue in this case seeped.[4]

Pursuant to the requirements of the Virginia Solid Waste Management Regulations (SWMR), 9 VAC § 20-81-10, et seq.,[5] the County installed a groundwater monitoring system in the early 1990s with regard to Phase II.[6]  See 9 VAC § 20-81-250; see also Code § 10.1-1410.2.  After detecting "statistically significant" levels of "solid waste constituents in one or more downgradient monitoring wells" in the Phase II area in 1998, the County filed Groundwater Protection Standards (GPS) with the Department of Environmental Quality (DEQ).  See 9 VAC § 20-81-250(A)(6).  DEQ approved the GPS for Phase II in 2001.

---

[4] Because the Phase II Disposal Area is the only portion of the solid waste disposal facility relevant to the issues in this appeal, we will refer to it in this opinion as "the Landfill" or "Phase II."

[5] In March 2011, the Department of Environmental Quality amended and renumbered the SWMR.  With respect to the regulations cited in this opinion, the changes were non-substantive.  We will thus refer to the current version of the SWMR.

[6] The County did not install monitoring wells at the northern boundary of the Landfill until 2002, allegedly because of incorrect advice from its engineers.

In 2002, a sampling from one of the monitoring wells revealed two constituents (trichloroethene and vinyl chloride) at concentration levels that exceeded their respective GPS. In accord with the SWMR's requirement that the owner or operator of a landfill take corrective action when a GPS "is exceeded at statistically significant levels," 9 VAC § 20-81-260(A), the County initiated a Nature and Extent Study (NES) and drilled additional groundwater monitoring wells "to address concerns regarding the possibility of groundwater contamination migrating beyond the facility property." Testing of samples taken from the additional monitoring wells revealed the presence of several "volatile organic compounds" (VOCs).[7] Among the VOCs detected, seven exceeded the GPS: benzene, chloroethane, dichloroethene, methylene chloride, tetrachloroethene, trichloroethene, and vinyl chloride. These VOCs were further classified as "either chlorinated hydrocarbons or aromatic hydrocarbons."

The analytical data collected during the NES revealed "a two-pronged (northern and eastern) plume composed of chlorinated and aromatic hydrocarbons present in the uppermost aquifer beneath" Phase II. The northern prong of the plume extended

---

[7] VOCs are "very volatile. . . . organic chemicals" that may include "components of gasoline." The VOCs initially detected were: "benzene; chlorobenzene; chloroethane; 1,2-dichlorobenzene; 1,4-dichlorobenzene; 1,1-dichloroethane; cis-1,2-dichloroethene; dichloromethane; tetrachloroethene, toluene; trichloroethene; vinyl chloride; and xylenes."

beyond the Landfill property approximately 2,000 feet onto the adjacent property owned by the Royals.  Data from some "off-site water supply wells" located on the Park indicated that the northern prong of the plume had impacted "some of the water supply wells in the [P]ark."  The "distribution and concentrations present in the northern prong of the plume [were] the result of a combination of landfill gas and leachate impacts to groundwater."

According to the NES, the northern prong of the plume "migrated in a direction that [was] contrary to the expected groundwater flow direction based on the potentiometric surface geometry."  The engineers conducting the NES developed three "hydrogeologic models/scenarios" to "explain the distribution and extent of the northern prong of the plume."  The first model involved "a potentiometric surface that was stressed by the groundwater withdrawal activities to the point where the hydraulic gradient along the northern property line of [Phase II] shifted from the apparent natural easterly gradient to one that sloped towards the water supply wells that [were] impacted."  The "second hydrogeologic model" pertained to "the presence of preferential flow pathways in the uppermost aquifer."  The third model provided "for structural control of the groundwater flow direction in the aquifer relative to the expected flow direction as suggested by the gradient of the

5

potentiometric surface."  In sum, the NES reported "that the northern prong of the groundwater plume, which [was] anomalous in terms of groundwater flow direction and velocity in relation to the eastern prong of the plume, [was] likely to be the result of a combination of extensive off-site groundwater withdrawal from the bedrock/saprolite interface, and preferential flow paths."  "Evidence indicate[d] the source of contaminants [was] both landfill gas and leachate from" Phase II and "that natural attenuation of the contaminants [was] occurring in the aquifer."

In October 2002, DEQ issued a "Notice of Violation" to the County, stating that the Landfill's "current groundwater monitoring system for the closed Phase II area [did] not ensure detection of groundwater contamination in the uppermost aquifer at the northern waste management unit boundary," i.e., the boundary between the Landfill and the Royals' property.  In a subsequent "Order by Consent," the County agreed, inter alia, to "submit a major Permit amendment for a corrective action program pursuant to [9 VAC § 20-81-260]."[8]  The County also agreed to notify "'all persons who own the land or reside on the land that directly overlies any part of the plume of contamination' that [had] migrated beyond the [Landfill's] boundary."

---

[8] The County also prepared an "Assessment of Corrective Measures" pursuant to 9 VAC § 20-81-260(C)(3), and a "Risk Assessment" to supplement the Assessment of Corrective Measures.

By letter dated September 19, 2003 the County informed Mr. Royal that "[g]roundwater contamination [had] been detected at various points under" the Park.[9]  In May 2005, the Royals filed a motion for judgment, alleging that the County's "Landfill operations have contaminated underground sources of drinking water at or near the Landfill and on the Park," and have caused the "discharge[]" of various "harmful and toxic chemicals, hazardous substances and pollutants from and in the Landfill waste mass to negatively impact the air, the groundwater, and the surface water on, within and under the Park."[10]

The Royals claimed the contamination constituted a "discharge of oil," in violation of Code § 62.1-44.34:18 of the Oil Discharge Law, and also damaged the Royals' property without just compensation, in violation of Article I, Section 11 of the Constitution of Virginia.  The Royals prayed for an award of damages against the County.[11]

---

[9] The Royals knew, before the September 2003 letter, about the potential groundwater contamination.  They drilled a monitoring well on their property in the spring of 2002 and learned that small amounts of some solid waste constituents were present in a few of the wells situated in the Park.

[10] The parties agreed that the groundwater of both the Landfill and the Park contained benzene, chloroethane, CIS-1, 2-dichloroethene, methylene chloride, tetrachloroethene, trichloroethene, and vinyl chloride.

[11] The Royals also asserted a claim for breach of contract, but that claim is not before us in this appeal.

The County denied that there had been a "discharge of oil" and that the Royals' property had been taken/damaged "within the meaning of Article 1, Section 11 of the Constitution of Virginia." After the parties engaged in discovery, the Royals and the County each filed motions for summary judgment.[12]

In their motion, the Royals argued, among other things, that the County was a "person discharging or causing or permitting a discharge of oil into or upon state waters" and was therefore liable for damages to their property and the Park pursuant to Code § 62.1-44.34:18. They also asserted that the County's operation of the Landfill had damaged their property, they had not been compensated for such damage, and thus the County was liable by reason of inverse condemnation. Conversely, the County contended that the Oil Discharge Law, when read as a whole, did not apply in the context of the County's operation of the Landfill. The County also argued that there were "material facts genuinely in dispute" with regard to the inverse condemnation claim.

---

[12] The County also filed a plea in bar, arguing that the Royals' claims were barred by the applicable statute of limitations for property damage and inverse condemnation claims. See Code §§ 8.01-243(B) -246(4), respectively. The trial court denied the plea in bar, holding that, pursuant to 42 U.S.C. § 9658(a)(1), the federal commencement date applied and the Royals' cause of action accrued when they knew or reasonably should have known of the damage to the Park. Although the County now challenges the trial court's denial of its plea in bar, we need not address that issue.

At an evidentiary hearing,[13] the County offered the testimony of Peter Garrett, a geologist, regarding the ways in which the groundwater could have been contaminated by the Landfill operations.  Garrett explained that the term "groundwater" means "the water in the ground below our water table [and] any water that percolates . . . to the water table." The term "leachate," according to Garrett, means "contaminated groundwater," whether "in that unsaturated zone percolating down into the water table" or already at that level and "moving with [the] groundwater to some other place."[14]  In landfills, Garrett explained, rainwater falling on the underground waste dissolves the "soluble components in that waste to form leachate." Garrett testified that the leachate from Phase II contained "[i]ndustrial solvents that are soluble in water."

In the case of landfill gas, Garrett offered three explanations as to how the groundwater could have become contaminated.  The gas "moves from areas of high pressure to

_____

[13] Initially, the hearing was to resolve disputed facts relevant to the County's plea in bar.  The trial court, however, used the testimony and documents presented at that hearing, along with discovery responses, in ruling on the cross-motions for summary judgment.  The court's use of those materials is not challenged on appeal.

[14] In the SWMR, the term " '[l]eachate' means a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials from such waste. [L]eachate that has contaminated groundwater is regulated as contaminated groundwater."  9 VAC § 20-81-10.

areas of low pressure . . . in any direction."  When that gas "gets in direct contact with the groundwater," the groundwater will become contaminated.  Landfill gas can also contaminate groundwater through condensation.  Because it is "quite warm," landfill gas will condense when it comes into contact with cooler soil, thus forming a condensate composed of the landfill gases on the soil.  This condensation will then "move downwards with the percolating [rainwater] toward the water table." Finally, the rainwater may absorb the landfill gas if it comes into contact with the gas.

Jeffrey D. Marshall also testified for the County as an expert in waste management and geology hydrology.  Marshall stated Phase II was a "trench-and-fill sort of landfill," where waste was placed into trenches.  When precipitation comes into contact with the waste, it migrates through the waste and "pick[s] up soluble constituents."  Without a plastic liner on the bottom of the Landfill,[15] the rainwater percolates through the soil and directly into the groundwater.  Marshall also explained contamination through landfill gas, stating that the organic components of the waste degrade and form gas, which then migrated carrying the "trace concentrations of those VOCs with

_____

[15] At the time the Landfill was built, solid waste disposal facilities were not required to install an underground plastic liner.

10

it."  Rainwater then percolates down and picks up some of the trace concentrations, carrying them down to the groundwater.

Marshall stated that the majority of the VOCs detected in the contaminated groundwater from Phase II were chlorinated solvents "commonly used in industry at the time" and often found in leachate in the groundwater around unlined landfills. Likewise, the other non-chlorinated VOCs, such as benzene, were "common constituents used in gasoline" and "commonly detected at all unlined landfills."

After the evidentiary hearing, the trial court issued a letter opinion, concluding that no material facts were genuinely in dispute as to the migration of benzene from the Landfill onto the Royals' property.[16]  The court further stated there was no dispute that benzene is a liquid hydrocarbon.  Thus, the court held that "on the basis of benzene alone being in the contaminated groundwater, the County is liable for any damages to the property of the Royals under the provisions of Code § 62.1-44.34:18(C)."  Based on the definition of the term "oil" in Code § 62.1-44.34:14, which includes "all other liquid hydrocarbons regardless of specific gravity," the court further concluded that the chlorinated hydrocarbons found in the

_____

[16] At a prior hearing on the cross-motions for summary judgment and the County's plea in bar, the trial court stated that the Oil Discharge Law, specifically Code § 62.1-44.34:18(C), applies in this case.

groundwater, "just as benzene, come within the provisions of Code § 62.1-44.32:18(C)."

With regard to the claim for inverse condemnation, the trial court concluded that "[t]he migration of contaminants from the [L]andfill into the groundwater on the Royal[s'] property makes [the] County liable for any damage or diminution of value for the Royal[s'] property." Thus, the trial court sustained the Royals' motion and granted summary judgment against the County, holding it liable on both the Oil Discharge Law and inverse condemnation claims asserted by the Royals.

Following an eight-day trial on the sole issue of damages, a jury returned a verdict for the Royals in the amount of $9 million. The trial court overruled the County's post-trial motion to set aside the verdict and entered judgment in accordance with the jury's verdict and also awarded the Royals attorneys' fees and costs in accordance with Code § 62.1-44.34:18(F). We awarded the County this appeal.

## II.  ANALYSIS

### A.  Issues and Standard of Review

On appeal, the County assigns error to the trial court's judgment on several grounds. The dispositive issue, however, is whether the trial court, in granting summary judgment, erred by holding that the contamination of groundwater beneath Phase II by the passive, gradual seepage of leachate and landfill gas and

12

the subsequent migration of that contaminated groundwater onto the Royals' property subjected the County to liability under Code § 62.1-44.34:18(C) of the Oil Discharge Law. See Andrews v. Ring, 266 Va. 311, 318, 585 S.E.2d 780, 783 (2003)("Summary judgment upon all or any part of a claim may be granted to a party entitled to such judgment when no genuine issue of material fact remains in dispute, and the moving party is entitled to judgment as a matter of law."). Answering this question requires an examination of both the Virginia Waste Management Act, Code §§ 10.1-1400 through -1457 (VWMA), and the Oil Discharge Law. Because this issue involves the interpretation of these relevant statutes, it is a pure question of law this Court reviews de novo. Renkey v. County Board, 272 Va. 369, 373, 634 S.E.2d 352, 355 (2006).

### B. Relevant Statutes

### 1. The VWMA

First passed in 1986, the VWMA requires any person who wishes to operate a "sanitary landfill or other facility for the disposal, treatment or storage of nonhazardous solid waste" to obtain a permit from the DEQ director. 1986 Acts ch. 492; Code § 10.1-1408.1(A). The DEQ director can amend or revoke a permit if the permit holder has violated any regulation that resulted in a release of harmful substances, maintained or operated a facility in such a manner as to pose a hazard to human health or

13

the environment, or if leachate from the landfill poses "a substantial threat of contamination or pollution of the air, surface waters, or [groundwater]."  Code § 10.1-1409(4).

Under the VWMA, the Virginia Waste Management Board (the Board) is authorized to "[s]upervise and control waste management activities in the Commonwealth."  Code § 10.1-1402(1).  Among other things, the Board is charged with: requiring maintenance of certain records and reporting systems, Code § 10.1-1402(7); promulgating and enforcing regulations, -1402(11); taking "actions to . . . clean up sites . . . where solid or hazardous waste" has been "improperly managed," -1402(19); and abating "hazards and nuisances dangerous to public health, safety, or the environment . . . created by the improper disposal, treatment, storage, transportation or management of substances within the jurisdiction of the Board," -1402(21).  In the event that hazardous or solid waste has been "improperly managed," the Board is authorized "to contain or clean up sites" and may institute legal proceedings to recover the costs of such "containment or clean-up activities from the responsible parties."  Code § 10.1-1402(19).

Pursuant to its authority under Code § 10.1-1402(11), the Board has promulgated extensive regulations governing solid waste management.  The purpose of the SWMR is "to establish standards and procedures pertaining to the management of solid

wastes by providing the requirements for siting, design, construction, operation, maintenance, closure, and postclosure care of solid waste management facilities in the Commonwealth in order to protect the public health, public safety, the environment, and our natural resources."  9 VAC § 20-81-25(A). Any person who operates a facility for the disposal, treatment, or storage of solid waste without a permit, or violates the SWMR or other laws with respect to the disposal or management of solid waste, is required to cease such activity and "initiate such removal, cleanup, or closure in place."  9 VAC § 20-81-40(D).  In addition to obtaining a permit, an owner or operator of a solid waste management facility is required to provide "financial assurance" for the "closure, post-closure care and corrective action at [such facility.]"  9 VAC § 20-81-90(C); 9 VAC § 20-70-30.

Although Phase II was permitted prior to the existence of the requirement, a solid waste management facility must now contain a "bottom liner," the specifications for which are outlined in the SWMR, to protect from and collect the leachate produced by the facility.  See 9 VAC § 20-81-130(J).  In addition, such facility is required to estimate the quality and quantity of leachate to be produced annually, devise a leachate collection system, and design and plan for the handling, storage and treatment of leachate.  9 VAC § 20-81-210(A).

"To provide for the protection of public health and safety, and the environment," the operator of a solid waste management facility must "ensure that decomposition gases generated at a landfill are controlled during the periods of operation, closure and postclosure care." 9 VAC § 20-81-200(A)(1). The operator must also "implement a gas monitoring program at the landfill," and the "monitoring network" must be "designed to ensure detection of the presence of decomposition gas migrating beyond the landfill facility boundary and into landfill structures." 9 VAC § 20-81-200(B)(1).

Of particular importance to the present case, "[o]wners and operators of all existing landfills shall be in compliance with the groundwater monitoring requirements specified in this section." 9 VAC § 20-81-250(A)(1)(a). Those requirements include the specification that such owners or operators "shall install, operate, and maintain a groundwater monitoring system that is capable of determining the landfill's impact on the quality of groundwater in the uppermost aquifer at the disposal unit boundary during the active life and postclosure care period of the landfill." 9 VAC § 20-81-250(A)(2)(a). The system must contain "a sufficient number of monitoring wells" to sample and analyze groundwater quality, including the groundwater quality "at the disposal unit boundary." 9 VAC § 20-81-250(A)(3)(a)(2). The SWMR includes a "Groundwater Solid Waste Constituent

16

Monitoring List" (Monitoring List), which contains many of the constituents found in the groundwater at issue in this case, including benzene. 9 VAC § 20-81-250, tbl. 3.1. If testing reveals a "statistically significant increase" above background values, the owner or operator of the facility must propose GPS "for all detected Table 3.1 Column B constituents." 9 VAC § 20-81-250(A)(6); see also 9 VAC § 20-81-250(B)(3)(d). If additional testing again reveals "statistically significant levels" above the GPS, the owner or operator must notify DEQ within 14 days and implement a "corrective action program." 9 VAC § 20-81-250(B)(2)(b)(1); see also 9 VAC § 20-81-260(A).

When a corrective action program is required, the owner or operator of a landfill initially must: install additional monitoring wells; notify all persons who own or reside on land that overlies the release of contaminants; "initiate an assessment of corrective measures or a proposal for presumptive remedy"; provide an additional $1 million in financial assurance; and hold a public meeting to discuss the corrective measures assessment or proposal for presumptive remedy. 9 VAC § 20-81-260(C)(1). As part of the assessment of corrective measures, the owner or operator must select a remedy that, inter alia, protects "human health and the environment," attains the GPS, and controls "the sources of releases so as to reduce or eliminate . . . further releases of solid waste constituents

17

into the environment."  9 VAC § 20-81-260(C)(3)(c).  After DEQ has reviewed the proposed remedy, the owner or operator must submit to DEQ a corrective action plan.  9 VAC § 20-81-260(D). Any groundwater monitoring to be employed in the corrective action plan must determine the "horizontal and vertical extent of the plume of contamination for constituents at statistically significant levels exceeding background concentrations."  9 VAC § 20-81-260(D)(1)(c).[17]

At the time of closing a landfill, the owner or operator "shall eliminate the post closure escape of uncontrolled leachate or of waste decomposition products to the groundwater or surface water to the extent necessary to protect human health and the environment."  9 VAC § 20-81-160(A); see also 9 VAC § 20-70-90(A).  Postclosure care requirements include maintaining the leachate collection system, the groundwater monitoring system, and the gas monitoring system.  9 VAC § 20-81-170(A)(1).

---

[17] DEQ required the County to submit a corrective action plan for the treatment of the on-site and off-site contaminated groundwater.

18

## 2. Oil Discharge Law

The Oil Discharge Law, which is found in Article 11 of the Water Control Law, falls under the purview of the State Water Control Board.  See Code §§ 62.1-44.3; -44.15.  And in contrast to the breadth of the VWMA when first enacted, the original Oil Discharge Law, enacted in 1973,[18] contained only two sections. Former Code § 62.1-44.34:1 defined the terms "discharge," "oil," "oil refinery," and "vessel," and former Code § 62.1-44.34:2 contained the following liability provision:

> Any person, firm or corporation owning or operating an oil refinery or any vessel while within State waters, which permits or suffers a discharge of oil into such waters, shall be liable to the Commonwealth of Virginia for all costs of cleanup or property damage incurred by the State or a political subdivision thereof, and any person showing damage to his property resulting from such discharge. In any suit to enforce the claims under this article, it shall not be necessary for the State, political subdivision, or person showing property damage, to plead or prove negligence in any form or manner on the part of the oil refinery or vessel.

In 1976, the General Assembly deleted the term "oil refinery" from that statute and replaced it with the term "facility," which it defined as "any development or installation . . . that deals in or handles oil, petroleum or any petroleum product or by-product."  1976 Acts ch. 51.  In 1978, the Oil Discharge Law was amended, inter alia, to impose a cap on

---

[18] See 1973 Acts ch. 417.

damages in the absence of negligence, grant the Water Control Board the authority to abate and contain a discharge of oil if the responsible party could not be identified, and require the "person, firm or corporation owning or operating any facility, vessel or vehicle from which there is a discharge of oil" to report such discharge to the Water Control Board.  1978 Acts ch. 816 (enacting former Code § 62.1-44.34:4).  In addition, the General Assembly expanded the liability provision from a "person, firm or corporation" that owned a facility or vessel, to "[a]ny person, firm or corporation causing or permitting a discharge of oil into State waters, or owning or operating any facility, vessel or vehicle from which there is a discharge of oil."  Id. (amending former Code § 62.1-44.34:2(A)).

In 1990, the General Assembly specifically defined the term "person" as "any firm, corporation, association or partnership, one or more individuals, or any governmental unit or agency thereof."  1990 Acts ch. 917 (enacting Code § 62.1-44.34:14). At that time, the General Assembly also added provisions relating to financial responsibility and oil discharge contingency plans, as well as "Exemptions" and "Exceptions." Id. (enacting Code §§ 62.1-44.34:16 and -44:34:17, and amending Code § 62.1-44.34:23).  The "Exemptions" provision relieved facilities and vessels with smaller storage and handling capacities from the requirements of filing an oil discharge

20

contingency plan and complying with the financial responsibility requirements. Id. The "Exceptions," meanwhile, precluded the application of any part of the Oil Discharge Law to several categories of unintentional discharges:

> (i) normal discharges from properly functioning vehicles and equipment, marine engines, outboard motors or hydroelectric facilities; (ii) accidental discharges from farm vehicles or noncommercial vehicles; (iii) accidental discharges from the fuel tanks of commercial vehicles or vessels that have a fuel tank capacity of 150 gallons or less; (iv) discharges authorized by a valid permit issued by the Board . . . ; (v) underground storage tanks regulated under a state program. . . .

Code § 62.1-44.34:23 (as amended by 1990 Acts ch. 917).

The provision of the Oil Discharge Law under which the trial court held the County liable currently provides:

> Any person discharging or causing or permitting a discharge of oil into or upon state waters . . . within the Commonwealth, discharging or causing or permitting a discharge of oil which may reasonably be expected to enter state waters . . . and any operator of any facility, vehicle or vessel from which there is a discharge of oil into or upon state waters, . . . shall be liable to:
>
> . . . .
>
> 4. Any person for injury or damage to person or property, real or personal, loss of income, loss of the means of producing income, or loss of the use of the damaged property for recreational, commercial, industrial, agricultural or other reasonable uses, caused by such discharge.

21

Code § 62.1-44.34:18(C). The liability provision also: allows the recovery of attorneys' fees and costs, Code §§ 62.1-44.34:18(F); imposes strict liability, -44.34:18(E); and requires any person or operator to implement "any applicable oil spill contingency plan" or take other action to contain and clean up a discharge, -44.34:18(B).

The term "[o]il" is defined as "oil of any kind and in any form, including, but not limited to, petroleum and petroleum by-products, fuel oil, lubricating oils, sludge, oil refuse, oil mixed with other wastes, crude oils and all other liquid hydrocarbons regardless of specific gravity." Code § 62.1-44.34:14. The term "[p]erson," still defined according to the 1990 amendment, includes "one or more individuals, or any governmental unit or agency thereof." Id. The term "[d]ischarge" is "any spilling, leaking, pumping, pouring, emitting, emptying or dumping." Id.

In the event of a discharge of oil, "any [person or] operator of any facility, vehicle or vessel from which there is a discharge" is required to immediately notify, among others, the Water Control Board. Code § 62.1-44.34:19. Upon finding a violation of the Oil Discharge Law, the Water Control Board may, inter alia, seek injunctive relief and recover "costs, damages and civil penalties." Code § 62.1-44.34:20(B). A person who "negligently" or "knowingly and willfully" discharges oil in

22

violation of the Oil Discharge Law can be convicted of a misdemeanor or a felony, respectively. Code § 62.1-44.34:20(E).

The remaining provisions of the Oil Discharge Law relate to facilities, operators, storage tanks, and vessels. In particular, Code § 62.1-44.34:15.1 authorizes the Water Control Board to promulgate regulations for aboveground storage tanks, and includes specific provisions to be included, while Code § 62.1-44.34:19.1 requires the registration of aboveground storage tanks. Pursuant to Code § 62.1-44.34:15(A), "[n]o operator shall cause or permit the operation of a facility . . . unless an oil discharge contingency plan applicable to the facility has been filed." The term "[f]acility" is "any development or installation within the Commonwealth that deals in, stores or handles oil, and includes a pipeline." Code § 62.1-44.34:14. The provisions of Code § 62.1-44.34:16 require the operators of facilities and tank vessels to establish and maintain financial responsibility against a discharge.

Similarly, the Oil Discharge Law's exemptions and exceptions also apply to certain categories of vessels, storage tanks, and facilities. The exemptions, listed in Code § 62.1-44.34:17, relieve facilities, tanks, and vessels with smaller storage and handling capacities from the oil contingency and financial responsibility provisions; exclude "nonpetroleum hydrocarbon-based animal and vegetable oils" from the definition

23

of oil for the purposes of the oil contingency plan and financial responsibility provisions; and relieve aboveground storage tanks with smaller storage capacity and facilities that do not resell oil from their aboveground storage tanks from the requirements of Code § 62.1-44.34:15.1.  The current exceptions, which exclude all coverage under the Oil Discharge Law, add to the 1990 amendment an exception for "releases from underground storage tanks . . . regardless of when the release occurred."  Code § 62.1-44.34:23(A)(vi).

The Virginia Administrative Code reflects a similar focus on storage tanks, vessels, and facilities.  The regulations governing the Water Control Board contain two chapters dealing with the Oil Discharge Law: Chapter 91, titled "Facility and Aboveground Storage Tank (AST) Regulation," 9 VAC § 25-91-10, et seq.; and Chapter 101, titled "Tank Vessel Oil Discharge Contingency Plan and Financial Responsibility Regulation," 9 VAC § 25-101-10, et seq.  As their titles suggest, these regulations apply only to aboveground storage tanks, facilities, and vessels.  See 9 VAC § 25-91-20; 9 VAC § 25-101-20.

C.    Applicability of Oil Discharge Law

According to the record at the summary judgment stage of this action, Phase II "release[d] solid waste constituents [which] impacted the groundwater in the uppermost aquifer beneath the facility."  The "single plume of impacted

24

groundwater" contained two prongs, one of which extended onto the Royals' property and impacted the Park's water supply wells. According to the NES, the groundwater contamination was caused by both landfill gas and leachate. Expert testimony established that leachate is formed when rainwater dissolves the "soluble components in [the] waste." One of the expert witnesses also explained that landfill gas can contaminate groundwater through landfill gas condensation on the soil being carried downward by rainwater, movement of landfill gas to areas of lower pressure where it then contacts the groundwater, or rainwater's absorbing landfill gas when it comes into contact with it. This natural movement of leachate and landfill gas directly into the groundwater was possible because Phase II was not required to have a bottom liner. Additionally, the migration of the northern prong of the plume was "contrary to the expected groundwater flow direction based on the potentiometric surface geometry."

These occurrences fall squarely within the ambit of the VWMA and SWMR. That is, the VWMA and SWMR extensively govern the operation of a solid waste disposal facility and impose requirements designed to protect groundwater and to prevent seepage of leachate and landfill gas into the groundwater.

Even though Phase II was closed in 1995, the County was required to install and maintain "a groundwater monitoring

25

system that [was] capable of determining [Phase II's] impact on the quality of groundwater in the uppermost aquifer at the [Landfill's] boundary during the . . . postclosure care period." 9 VAC § 20-81-250(A)(2)(a). Indeed, the Notice of Violation issued by DEQ to the County asserted that the County's groundwater monitoring system for the closed Phase II did not ensure detection of contaminated groundwater in the uppermost aquifer at the northern boundary between the Landfill and the Royals' property.

In addition to maintaining a groundwater monitoring system after closure of a solid waste disposal facility, the SWMR also require the owner or operator of a landfill to maintain both the leachate collection system and the landfill gas monitoring system, as applicable, during the postclosure period. That period is "a minimum of 10 years for sanitary landfills that ceased to accept wastes before October 9, 1993" and "a minimum of 30 years" for those that "received wastes on or after October 9, 1993." 9 VAC § 20-81-170(B)(2).

Given the specific and all-embracing coverage under the VWMA and SWMR of the occurrences at issue in this case, we conclude that the General Assembly intended such occurrences to be governed exclusively by the VWMA. Cf. City of Lynchburg v. Dominion Theatres, Inc., 175 Va. 35, 43, 7 S.E.2d 157, 160 (1940) (legislation manifesting the "intention to occupy the

26

entire field [was] found in the very statutes themselves when considered as a whole").  We thus disagree with the trial court's conclusion that the Oil Discharge Law applies to the specific groundwater contamination in this case.  Simply put, the Oil Discharge Law does not contemplate the passive, gradual seepage of leachate and landfill gas into groundwater beneath a solid waste disposal facility.

The Oil Discharge Law falls under the authority of the Water Control Board, rather than the Waste Management Board, and contains entirely different procedures in the event of a discharge of oil.[19]  See Code §§ 62.1-44.34:19, -44.34:20.  Upon a discharge of oil, the person or operator responsible must notify immediately the Water Control Board, implement any applicable oil spill contingency plan, and take action to contain and clean up the discharge.  Code §§ 62.1-44.34:19, -44.34:18(B).  Unlike many oil discharges, the groundwater contamination in this case, whenever it initially occurred, was not immediately known.  It became known years after Phase II was closed as a result of the continued groundwater monitoring required by the SWMR.  Only after testing revealed statistically significant increases of constituents in the Monitoring List

---

[19] Both the State Water Control Board, see Code § 62.1.44.7, and the Department of Waste Management, see Code § 10.1-1401, are within the DEQ.  Code § 10.1-1183.

27

above the previously established GPS was the County required to notify DEQ and implement a corrective action program. 9 VAC § 20-81-250(B)(2)(b)(1); see also 9 VAC § 20-81-260(A).

Most striking, however, is the contrast between the extensive regulations under the VWMA governing a solid waste disposal facility's groundwater monitoring and leachate control and the lack of any regulations under the Oil Discharge Law that are applicable to a such a facility. If the General Assembly had intended the Oil Discharge Law to apply to occurrences such as those in this case, regulations governing the seepage of "liquid hydrocarbons regardless of specific gravity" via leachate and landfill gas into groundwater would be in place. Code § 62.1-44.34:14.

The Royals urge this Court to focus only on Code § 62.1-44.34:18 and can point to no other provision of the Oil Discharge Law that applies to the County's operation of the Landfill. Because the meaning of "person" as used in that statute includes a "governmental unit," they argue, the County is subject to liability in this case. The Royals are correct that the County comes within the meaning of the term "person." See Code § 62.1-44.34:14. But citing the meaning of "person" does not respond to the question posed by the peculiar facts in this case: whether the contamination of groundwater by the passive, gradual seepage of leachate and landfill gas falls

28

within the purview of the Oil Discharge Law or is governed solely by the VWMA.[20] We must answer that question without stripping the liability provision, Code § 62.1-44.34:18, from the larger legislative context in which the General Assembly placed it. See, e.g., Shivaee v. Commonwealth, 270 Va. 112, 124, 613 S.E.2d 570, 577 (2005) (applicability of statute was clear when read in context of other provisions in the same act).

Based on the examination of these two statutory schemes, we conclude that the Oil Discharge Law does not apply to the contamination of groundwater as it occurred in this case, i.e., by the passive, gradual seepage of leachate and landfill gas from Phase II into the groundwater beneath it. Thus, we will reverse the judgment of the trial court holding the County liable under the Oil Discharge Law.

That conclusion, however, does not end our analysis. As stated above, the trial court granted summary judgment, finding the County liable under both the Oil Discharge Law and inverse condemnation claims asserted by the Royals. Citing this, the Royals contend that based on the County's liability for inverse condemnation alone, which is not challenged on appeal, they are entitled to the jury's award of damages even if the trial court

---

[20] Nor is the question answered by the provision in the County's permit to operate the Landfill, stating that "[c]ompliance with the terms of this permit does not constitute a defense to . . . any other law or regulation." See also Code § 10.1-1408.1(F).

29

erred by holding the County liable under the Oil Discharge Law. The County, meanwhile, asserts the Royals failed to proceed on their inverse condemnation claim at the jury trial on the issue of damages.

At the commencement of that jury trial, the trial court instructed the jury that it had granted summary judgment in favor of the Royals against the County on the issue of liability under both the inverse condemnation claim and the discharge of oil claim. Following the presentation of evidence, the Royals only offered one instruction on damages (Instruction 1). That instruction read:

> In determining the damages to which the plaintiff is entitled, if any, you should consider any of the following which you believe by the greater weight of the evidence was caused by the defendant:
>
> (1) Any damage to property, real or personal;
>
> (2) Any loss of income;
>
> (3) Any loss of the means of producing income; or
>
> (4) Any loss of the use of the damaged property for recreational, commercial, industrial, agricultural or other reasonable uses.

This instruction mirrors almost verbatim the Oil Discharge Law's damages provision. Code § 62.1-44.34:18(C)(4). That statute authorizes damages for "injury or damage to person or property, real or personal, loss of income, loss of the means of

30

producing income, or loss of the use of the damaged property for recreational, commercial, industrial, agricultural or other reasonable uses." Id. The similarity of language makes apparent that Instruction 1 pertained to the Royals' claim under the Oil Discharge Law, not their inverse condemnation claim.

Furthermore, Instruction 1 does not contain the proper measure of damages for inverse condemnation. "The correct measure of damages, in all [cases for damaging or taking without just compensation], is undoubtedly the diminution in value of the property by reason of the change, or the difference in value before and after the change." Town of Galax v. Waugh, 143 Va. 213, 229, 129 S.E. 504, 509 (1925); see Richmeade, L.P. v. City of Richmond, 267 Va. 598, 603, 594 S.E.2d 606, 609 (2004) (measurement of damages for inverse condemnation is "based on a decline in the value of the subject property"). Instruction 1's phrase "[a]ny damage to property, real or personal" does not necessarily mean only "diminution in value."

In this case, the former could encompass the replacement value of the contaminated groundwater, about which one of the Royals' expert witnesses testified. The witness opined that the replacement cost of the contaminated groundwater that was the source of drinking water to the Park residents was $2 million. Diminution in value of real property is not replacement value. Given the difference between Instruction 1 and the proper

31

measure of damages for inverse condemnation, the jury's award of damages was limited to the Royals' claim under the Oil Discharge Law. Therefore, contrary to the Royals' contention, there is no independent basis for the jury's damage award to which the County failed to assign error on appeal. See United Leasing Corp. v. Thrift Ins. Corp., 247 Va. 299, 308, 440 S.E.2d 902, 907 (1994) (no relief on appeal if appellants fail to assign error to an independent ground adopted by the trial court for its ruling).

The Royals' failure to offer a jury instruction addressing the measure of damages for their inverse condemnation claim is also evident from a post-trial colloquy between the trial court and the parties. After trial, the County moved to amend the final order to reflect that the Royals' inverse condemnation claim did not go to the jury. The Royals maintained, as they do here, that Instruction 1 covered inverse condemnation damages. The trial court disagreed, stating that if it had been an inverse condemnation case, the court would have instructed the jury that it could "award the [Royals] damages for the difference between the value of the property before the taking and the value after the taking." Instruction 1, the trial court stated, was not "put in those terms." The trial court concluded:

> [T]he [c]ourt gave only the damage instruction
> under the [Oil Discharge Law] because that's what
> the evidence supported [and] had the instruction
> been offered . . . there's probably a good chance
> that the [c]ourt would not have sent that issue
> to the Jury.  I sent the issue to the Jury that
> the evidence supported.

This colloquy confirms what is already apparent: the Royals pursued only their claim under the Oil Discharge Law at the jury trial on the issue of damages.

In sum, the Royals abandoned their inverse condemnation claim by offering Instruction 1 as the sole damages instruction. Although the trial court, in its summary judgment ruling, found the County liable under inverse condemnation, Instruction 1 did not encompass the proper measure of damages for that claim.  As the law of this case, Instruction 1 binds both this Court and the Royals in this appeal.  See Wintergreen Partners, Inc. v. McGuireWoods, LLP, 280 Va. 374, 379, 698 S.E.2d 913, 916 (2010). Therefore, having reversed the trial court's judgment holding the County liable under the Oil Discharge Law, there is no basis on which the Royals can pursue their inverse condemnation claim or retain the jury's award of damages.

III. CONCLUSION

Because we conclude that the trial court erred in awarding summary judgment to the Royals and finding the County liable under the Oil Discharge Law, we will reverse the trial court's judgment. Further, because there is no unchallenged, independent basis for the jury's award of damages, we will enter final judgment for the County.

<u>Reversed and final judgment</u>.


JUSTICE POWELL, with whom JUSTICE LEMONS joins, dissenting.

I respectfully disagree with the majority's conclusion that the State Water Control Law, Code §§ 62.1-44.2 through -44.34:28 (the Water Control Law), specifically Code § 62.1-44.34:18(C) of the "Discharge of Oil into Waters" Law, Code §§ 62.1-44.34:14 through -44.34:23 (the Oil Discharge Law), does not apply to the leachate contamination at issue in this case.

Here, the circuit court found that the County admitted that benzene is a "pure liquid hydrocarbon."[1] The circuit court

---

[1] Although it does not appear from the parties' admissions that the County specifically admitted that benzene was a "pure liquid hydrocarbon," the County did not assign error to this finding and as such, we cannot disturb that finding on appeal. Rule 5:17(c)(1)(i). The County further admitted that benzene is a hydrocarbon and an aromatic hydrocarbon. Moreover, benzene is a "colorless, <u>liquid</u>, inflammable, aromatic hydrocarbon . . . ." 2 Charles K. Bradsher, <u>Benzene</u>, McGraw-Hill Encyclopedia of Science & Technology 695 (10th ed. 2007)(emphasis added); <u>see also</u> Webster's Third New International Dictionary 205

34

stated in its letter opinion, "on the basis of benzene alone being in the contaminated groundwater, the County is liable for any damages to the property of the Royals under the provisions of Code § 62.1-44.34:18(C)."  Therefore, I would affirm the ruling for the following reasons: 1) the Oil Discharge Law by its terms demonstrates its broad scope through its stated purpose and exceptions, 2) the plain reading of the Code captures the facts at issue here, 3) the County's "CERCLA petroleum exception" argument is not preserved, and 4) if the admission of Dr. Vittorio Bonomo's testimony as to "the damages . . . that the Royals have suffered as a result of the contamination" was error, it most certainly was harmless.

SCOPE OF THE OIL DISCHARGE LAW

Although Virginia has not addressed the issue of whether the Water Control Law applies to landfills that are also governed by the VWMA and the SWMR, there is nothing in the statutory scheme of the Water Control Law, or the Oil Discharge Law specifically, that precludes the application of these laws to the facts presented here.  Indeed, the contrary is true.  The expressed purpose of the Water Control Law is to

> (1) protect existing high quality state waters
> and restore all other state waters to such
> condition of quality that any such waters will

---

(1993)(defining "benzene" as "a colorless volatile flammable toxic liquid aromatic hydrocarbon . . . .")

permit all reasonable public uses and will support the propagation and growth of all aquatic life, including game fish, which might reasonably be expected to inhabit them; (2) safeguard the clean waters of the Commonwealth from pollution; (3) prevent any increase in pollution; (4) reduce existing pollution; (5) promote and encourage the reclamation and reuse of wastewater in a manner protective of the environment and public health; and (6) promote water resource conservation, management and distribution, and encourage water consumption reduction in order to provide for the health, safety, and welfare of the present and future citizens of the Commonwealth.

Code § 62.1-44.2. The statutory scheme specifically states that "[t]his Chapter is intended <u>to supplement existing laws</u> and no part thereof shall be construed to repeal any existing laws specifically enacted for the protection of health . . . ." Code § 62.1-44.6 (emphasis added).

The scope of the Act is broad. This Court has previously considered the scope of the Water Control Law. <u>Commonwealth ex rel. State Water Control Board v. County Utilities Corp.</u>, 223 Va. 534, 539, 290 S.E.2d 867, 870 (1982). There, in the context of a sewage treatment plant, we stated:

> The powers and duties of the Board are to be found in the State Water Control Law, c. 3.1 of Title 62.1 of the Code, (§ 62.1-44.2, <u>et seq.</u>). The Board's declared purposes are to reduce existing pollution, prevent increased pollution, and safeguard the clean waters of the State from pollution. § 62.1-44.2. It is required to make appropriate studies of water quality and, after due notice and hearing, to establish and enforce standards of water quality. § 62.1-44.15. The discharge of wastes into the State waters is to be limited by certificates issued by the Board,

36

and subject to the conditions contained therein. Such certificates may be modified, amended, or revoked by the Board from time to time, after due notice and hearing. § 62.1-44.5 and § 62.1-44.15(5). Sewage treatment is regulated by Article 4 (§ 62.1-44.18, et seq.), which provides that such treatment plants shall be under the joint supervision of the Board and the State Department of Health. The Board has the power to amend, revoke, and modify discharge certificates to assure compliance with its established water control standards. § 62.1-44.19.

Id.

While not binding on this Court, I find a subsequent decision from the United States District Court for the Eastern District of Virginia that considered these code sections in deciding whether strict liability extended to the discharge of oil onto private lands, Gollobin v. Air Distributing Co., 838 F.Supp. 255 (E.D. Va. 1993), persuasive as to the expansive reach of the Oil Discharge Law. There, the District Court looked at the history of this legislation and noted that

> [u]ntil 1990, liability for the discharge of oil was found in Virginia Code §§ 62.1-44.34:2 & :3, which only prohibited "a discharge of oil into state waters . . ." and "the discharge of oil into or upon the waters of the Commonwealth." Then, in 1990, the General Assembly enacted § 62.1-44.34:14, et. seq., to amend and replace §§ 62.1-44.34:2 & :3, which were repealed. The amended version of the statute expands the reach of the existing legislation beyond state waters to include lands and storm drain systems. Specifically, the amended statute declares that "the discharge of oil into or upon state waters, lands, or storm drain systems within the Commonwealth is prohibited." Virginia Code § 62.1-44.34:18.

37

Id. at 256-57 (emphasis added).  The Court concluded that "the statute's purpose is to provide the Commonwealth of Virginia or any political subdivision thereof or any person with a remedy when a discharge of oil causes harm to human health or welfare, harm to the environment, or damage to personal or real property."  Id. at 258.

As further evidence of the broad scope of the law, the General Assembly chose to exempt several categories of unintentional discharges of oil and did not include landfills among these exemptions.  Code § 62.1-44.34:23(A).  To conclude that this law does not apply would add landfills to the exemptions delineated by the General Assembly.  "Courts cannot 'add language to the statute the General Assembly has not seen fit to include.' "  Jackson v. Fid. & Deposit Co., 269 Va. 303, 313, 608 S.E.2d 901, 906 (2005) (quoting Holsapple v. Commonwealth, 266 Va. 593, 599, 587 S.E.2d 561, 564-65 (2003)).

> The maxim expressio unius est exclusio alterius applies when mention of a specific item in a statute implies that omitted items were not intended to be included.  Turner v. Wexler, 244 Va. 124, 127, 418 S.E.2d 886, 887 (1992).  "The question here is not what the legislature intended to enact, but what is the meaning of that which it did enact.  We must determine the legislative intent by what the statute says and not by what we think it should have said."  Id. (quoting Carter v. Nelms, 204 Va. 338, 346, 131 S.E.2d 401, 406-07 (1963)).

<u>Virginian-Pilot Media Cos. v. Dow Jones & Co.</u>, 280 Va. 464, 468-69, 698 S.E.2d 900, 902 (2010).

Moreover, I note that the State Water Control Board ("SWCB") has a regulation that covers landfills. 9 VAC § 25-151-190. This regulation defines "leachate" as a "liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste[,]" 9 VAC § 25-151-190(C), and specifically requires inspections of inactive landfill sites, such as the one at issue here. 9 VAC § 25-151-190(D)(2)(c)(2). Although this regulation does not specifically relate to the situation presented by this case, it is instructive in demonstrating that monitoring landfills is within the purview of the SWCB.

APPLICATION OF THE OIL DISCHARGE LAW TO THIS CASE

Given that I would conclude that the Oil Discharge Law does apply to the situation presented in this case, I now turn to whether Campbell County is liable to the Royals under the Oil Discharge Law. Code § 62.1-44.34:18(C)(4) prohibits

> [a]ny person discharging or causing or permitting a discharge of oil into or upon state waters, lands, or storm drain systems within the Commonwealth, discharging or causing or permitting a discharge of oil which may reasonably be expected to enter state waters, lands, or storm drain systems, or causing or permitting a substantial threat of such discharge and any operator of any facility, vehicle or vessel from which there is a discharge of oil into or upon state waters, lands, or storm drain

39

systems within the Commonwealth, or from which there is a discharge of oil which may reasonably be expected to enter state waters, lands, or storm drain systems, or from which there is a substantial threat of such discharge, shall be liable to: . . . . [a]ny person for injury or damage to person or property, real or personal, loss of income, loss of the means of producing income, or loss of the use of the damaged property for recreational, commercial, industrial, agricultural or other reasonable uses, caused by such discharge.

Under the Oil Discharge Law,

"Discharge" means any spilling, leaking, pumping, pouring, emitting, emptying or dumping.

"Facility" means any development or installation within the Commonwealth that deals in, stores or handles oil, and includes a pipeline.

"Oil" means oil of any kind and in any form, including, but not limited to, petroleum and petroleum by-products, fuel oil, lubricating oils, sludge, oil refuse, oil mixed with other wastes, crude oils and all other liquid hydrocarbons regardless of specific gravity.

. . . .

"Person" means any firm, corporation, association or partnership, one or more individuals, or any governmental unit or agency thereof.

Code § 62.1-44.34:14.

Based on the circuit court's factual finding that benzene was a "liquid hydrocarbon[,]" I believe that reversal is improper. Under the clear definitions of the Oil Discharge Law, the County clearly qualifies as a "person." Code § 62.1-44.34:14. A "discharge" includes both "leaking" and "emitting".

40

Id. The circuit court's factual finding that the parties agreed that benzene was liquid hydrocarbon places the substance found to have been emitted from the Campbell County landfill within the Oil Discharge Law's definition of "oil." The County argues that the landfill is not a "facility" within the meaning of the Act. Because the statute is written in the disjunctive, I think that this argument is without merit. The "operator" of a "facility" is merely one type of violator, in addition to "person" under this Code section. Thus, I would hold that the County is liable under the Oil Discharge Law.

CAMPBELL COUNTY'S REMAINING ASSIGNMENTS OF ERROR

Because I would affirm the circuit court's application of the Oil Discharge Law to the Campbell County landfill, I must now address Campbell County's remaining assignments of error: 1) the CERCLA petroleum exclusion contained in 42 U.S.C. § 9658 applies, 2) the circuit court erred in overruling the County's motion to strike Dr. Vittorio Bonomo's testimony as speculative and 3) the circuit court erred in denying the County's motion to set aside the verdict based on "speculative testimony" that the park was worthless.

Campbell County argues that the "CERCLA petroleum exclusion" specifically bars the contaminants at issue here from being covered by CERCLA, which would otherwise preempt state law by delaying the commencement of a state statute of limitations

41

until the plaintiff knows, or reasonably should have known, of the contamination damage. The County acknowledges that this argument was not specifically raised in the circuit court. However, the County argues that because both the County and the Royals cited First United Methodist Church v. United States Gypsum Co., 882 F.2d 862, 866-69 (4th Cir. 1989), in their briefs to the circuit court, this preserves the issue for our consideration. As the issue in First United Methodist Church dealt with CERCLA's applicability to asbestos-removal actions, see 882 F.2d at 866-69, it has no applicability to the CERCLA petroleum exclusion. Moreover, beyond citing to the case, the parties made no argument as to how it applied to the facts in this case. For that reason, the County's petroleum exclusion argument is not preserved. Accordingly, I would conclude that Rule 5:25 bars our consideration of this issue.

Turning to the County's evidentiary arguments, even if portions of Dr. Bonomo's testimony were speculative and not based on specific, articulable facts, I believe that any error in allowing the testimony was harmless.[2]

> In Clay v. Commonwealth, 262 Va. 253, 546 S.E.2d
> 728 (2001), this Court adopted the following test

---

[2] The County also argues before this Court that the testimony from Dr. Bonomo was prejudicial. The County never argued below that the testimony was prejudicial and, therefore, I would also hold that under Rule 5:25, we may not consider that argument.

for non-constitutional harmless error: "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected . . . . If so, or if one is left in grave doubt, the conviction cannot stand."  Id. at 260, 546 S.E.2d at 731-32 (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)).

Atkins v. Commonwealth, 272 Va. 144, 154, 631 S.E.2d 93, 98 (2006).  Dr. Bonomo's testimony did not add to the numerical calculation of damages that was firmly established by other experts testimony, and the testimony of another plaintiffs' expert, Andrew Flynn, was substantially similar to Dr. Bonomo's. Therefore, I do not believe that the admission of such testimony was reversible error.  For the foregoing reasons, I would affirm.